THE STATE OF MISSOURI, Respondent, v. J. H. TOWNSEND, Appellant.

St. Louis Court of Appeals, October 25, 1892.

1. **Criminal Law**: INFORMATION. When the sufficiency of an information is challenged for the first time upon an appeal by the defendant after his conviction, he is not entitled to complain of the absence of averments, claimed to be essential, unless the defect is one which tends to the prejudice of his substantial rights, or the information fails to inform him fully of the offense of which he stands charged.

2. ———: ———. And *held*, that the information in this cause, wherein the defendant had been convicted of a violation of the provisions of the act against bookmaking on horseraces in other states (Laws, 1891, p. 122), was sufficient under this rule.

3. ———: ———. And *held*, further, that the evidence in this cause was sufficient to warrant the conviction of the defendant.

*Appeal from the St. Louis Court of Criminal Correction.*
HON. J. R. CLAIBORNE, Judge.

AFFIRMED.

*William C. Jones, Charles F. Joy* and *Edward S.* *Robert,* for appellant.

Accepting money to be transmitted out of the state to a point where it is to be bet is not a violation of the statute. *People v. Winn,* 12 N. Y. Sup. 379; *People v. Winn,* 128 N. Y. 599. The information is defective for failing to show with whom the bet was made. 1 Chitty on Criminal Law [4 Am. Ed.] 210, 211; *Butler v. State,* 5 Blackf. 280; *Ball v. State,* 7 Blackf. 242; *Grover v. State,* 6 Fla. 39; *Sharpe v. State,* 6 S. Rep. 657; *Parrot v. State,* 10 Ark. 574; *Jester v. State,* 14 Ark. 552. The statute on which the information is based does not forbid wagering, and, therefore, the information is fatally defective. Session Laws, 1891, p. 122. The first count in the information does not charge the defendant with the violation of any provision of the statute upon which the information is grounded. Session Laws, 1891, p. 122. The court erred in refusing to make the declaration of law as set out in defendant's instruction, numbered 5. Session Laws, 1891, p. 122. The court erred in refusing to declare the law as expressed in defendant's instruction, numbered 1. The state completely failed in the following particulars to make a *prima facie* case against the defendant: *First,* it offered no evidence to show that a pool was sold; *second,* that a bet was made; *third,* or that a race was run; *fourth,* or that there was any such horse as Matagorda in existence or entered in any race.

*Bernard Dierkes,* Prosecuting Attorney, and *Thomas B. Harvey* and *Leverett Bell,* for respondent.

In support of the judgment below, the respondent will rely on three propositions, namely: *First.* The act of the legislature of April 1, 1891, Laws of 1891,

page 122, is a constitutional enactment. *State v. Burg-doerfer*, 107 Mo. 1. *Second.* The first count of the information states an offense under said act. *Third.* The testimony in this case made out said offense. *People v. Fisher*, 17 N. Y. Sup. 162.

ROMBAUER, P. J.—This is a prosecution under the act to prohibit bookmaking and pool-selling, approved April 1, 1891. Laws, 1891, p. 122. This act, after prohibiting under severe penalties, the recording or registering of bets or wagers or selling pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast, which is to be made or take place beyond the limits of this state, concludes as follows: "The lessee or occupant of any room, shed, tenement, tent, booth or building, who becomes the custodian or depository for hire or privilege of any money or property or thing of value which is staked, wagered or pledged contrary to the provisions of this act, shall be guilty of a misdemeanor, and on conviction shall be punished by imprisonment in the county jail for a period of one year, or by a fine of $1,000, or both.

The defendant was tried upon an information charging him with a violation of the provisions of this act in three counts. The second and third counts charged him with unlawfully recording and registering bets and keeping devices for that purpose, contrary to the provisions of the act. He was acquitted on these counts, but convicted on the first and fined $1,000. He appeals, assigning for error that the count of the information on which he was convicted is defective, and that the evidence was insufficient to warrant his conviction.

The count on which the defendant was convicted, omitting formal parts, is as follows: "That J. H. Townsend, in the city of St. Louis, on the sixteenth day of March, 1892, did unlawfully become the custo-

dian and repository for hire of $5 in lawful money of the United States, which money was then and there staked, wagered and pledged by one C. C. Jones, upon the result of a contest of speed and endurance of a horse named Matagorda, which contest was made and took place on said day beyond the limits of the state of Missouri, to-wit, in the state of New Jersey, contrary to the statute in such case made and provided, and against the peace and dignity of the state."

It is claimed by the defendant that this count is defective because it does not appear by its recitals that the money, of which defendant became the custodian, was wagered or pledged in the purchase or sale of an interest in a pool in a horserace, or that the defendant knowingly became the custodian of an amount wagered and registered in making a book, that being the only species of horserace gambling prohibited by this statute, and that the information is further defective in failing to show with whom the bet was made.

We must state at the outset that this information was not challenged for insufficiency by motion to quash. The record shows that the defendant waived the reading of the information, and pleaded not guilty thereto, and did not even file a motion in arrest after conviction. The only question, therefore, for our consideration is, whether the alleged defect in the information is one tending to the prejudice of the substantial rights of the defendant upon the merits, and whether the information fails to inform the defendant fully of the offense of which he stands charged. R. S. 1889, sec. 4115.

In indictments for gaming it is usually necessary to state the name of the person with whom defendant gamed or wagered, or else that the name of such person is unknown (1 Chitty on Criminal Law, 211; *Butler v. State*, 5 Blackf. 280; *Jester v. State*,

14 Ark. 552), but how can this rule of requiring a statement of name be made applicable to pool betting, where the better himself does not know against whom he bets. The omission of the allegation, that the name of the person with whom the wager was made was unknown, may tend to affect the formal sufficiency of the indictment or information, but has certainly no tendency to affect the substantial rights of the defendant upon the merits. It is true the information does not use the words, pool-selling or bookmaking, or that the defendant became the custodian of money staked in either, but it does state that the money of which he became custodian was staked on a day named upon the result of a contest of speed and endurance of a horse named Matagorda, which contest was made and took place beyond the limits of this state, contrary to the form of the statute, and the evidence adduced upon the trial by the state, as well as by the defendant, and heard without objection, clearly shows that the defendant was throughout aware of the offense with which he stood charged. We must, therefore, conclude that the objection to the information, being now made for the first time, comes too late, and must be overruled.

Before proceeding to the consideration of the evidence, it becomes essential to consider the scope of the act itself under which the proceedings were had, and its proper construction. The act is not leveled against betting on either foreign or domestic horseraces, but against pool-selling and bookmaking on horseraces which take place beyond the limits of this state. It does not, as the supreme court decides in *State v. Burgdoerfer*, 107 Mo. 1, legalize the sale of pools or making of books on horseraces which take place within this state, either expressly or by implication. It simply leaves the law as to betting on races as it was heretofore, but expressly prohibits bookmaking and

pool-selling on horseraces beyond the limits of this state, under severe penalties.

The defendant contends that the state failed to make a *prima facie* case against him, because it offered no evidence to show that a pool was sold, or that a bet was made, or that a race was won, or that there was any such horse as Matagorda in existence or entered in any race.

In passing upon the question whether the evidence supports the judgment, we must consider all the evidence in the case which has any tendency to bear upon the question of guilt, including inferences which might properly be made by the trier of the facts from other facts established. Upon a careful examination of the record we find evidence tending to show the following facts: The defendant is the president of a corporation known as the Mercantile Telegraph Company, and formed under the laws of the state of Illinois. The organization of such corporation was completed on January 4, 1892, a few months after the law of 1891, under which this proceeding is had, went into effect. The corporation opened offices in the cities of St. Louis, Chicago and St. Paul, and at no other place. It had no wires of its own, but leased one wire from St. Louis to Chicago, and two wires from Chicago to St. Paul. It had only one office in the city of St. Louis, which was immediately adjacent to the saloon of one Furber, who is shown to have run a pool room in this city prior to the time when the law of 1891 went into effect. In the room occupied by the defendant, and at the same table with one of defendant's operators, sat an employe of Furber, who was charged with obtaining constant information by wire from the racing bureau of the Western Union Telegraph Company. This information, as soon as received, was transferred to a blackboard, conspicuously displayed in the saloon of Furber,

adjacent to the defendant's premises. The telegraph business of the defendant's corporation consists almost exclusively in taking money orders for money to be placed on horses, in races taking place beyond the limits of this state, by the process hereinafter fully described. The manager of the company, one Hoffman, was employed as a bookmaker for Burgdoefer up to the time of entering into the employment of this corporation. Van Henning, another manager of the company, was employed in Furber's pool room before it shut down.

On the blackboard in Furber's saloon were written daily the names of various horses, the weights, the riders, the time the race was over, at various points outside of the state of Missouri on said day, and among others, at Guttenberg, New Jersey, and the odds on the horses. The odds were changed from time to time during the day, by a boy in the employment of said Furber, from information furnished him from the office of the Mercantile Telegraph Company by the telegraph operator employed by said Furber, and located in said office. A person, desiring to bet on a horse entered in any of said races, at the odds indicated on said blackboard, deposited the money he desired to wager with the defendant, together with a small fee for the telegraphic transfer, and received a receipt therefor, stating that the amount was to be transferred by telegraph to one Frank N. Shaw, at St. Paul, Minnesota, and at the same time the party depositing the money signed an order directing the Mercantile Telegraph Company to pay the amount to said Shaw at St. Paul, aforesaid, and also a telegraphic message addressed to said Shaw at St. Paul, aforesaid, directing him to put the money deposited on the horse, naming him, at the odds specified, which odds corresponded with those given on the blackboard. All similar transactions, as far as the testimony shows,

were had in the name of F. N. Shaw. The blanks necessary in the above matter were provided by the defendant in the Mercantile telegraph office, and the business was conducted each day up to the time the horses were at the post, which fact was indicated by the boy writing on the blackboard the word "post" underneath the race. If the horse on which the money was placed won, the holder presented the receipt to the cashier's window in the telegraph office and received the amount of money he had won at the odds named in the telegram.

It also appeared in evidence that C. C. Jones, on March 16, 1892, went to the office of the Mercantile Telegraph Company and said to the defendant that he wanted to put $2 on a horse. The defendant replied that he would tell him how to put $5 on a horse, and directed him to the blackboard on Furber's premises to select a horse. Jones selected a horse named "Matagorda," entered on the blackboard at the odds of four to one on a race at Guttenberg, New Jersey, to take place on that day and within ten minutes of the transaction; and he paid $5, the amount of the bet, and five cents for the transfer, to the defendant or one of his employes in the telegraph office, and the following documents were executed on blanks provided by the telegraph company:

*First.* A receipt as follows:

"[Form 4.]　　St. Louis, March 16, 1892.

"Received $5 from C. C. Jones, such amount to be transferred by telegraph to Frank N. Shaw, at St. Paul, Minnesota.　　J. H. Townsend,

"Manager Mercantile Co."

*Second.* A telegram as follows:

"[Form 2.]　　St. Louis, March 16, 1892.

*"To F. N. Shaw, St. Paul, Minn.:*

"Put $5 on Matagorda at four to one for me.

"C. C. Jones."

And, *third*, an order as follows:

"No. 53.	March 16, 1892.

"*Mercantile Telegraph Company:*

"Pay to F. N. Shaw, St. Paul, Minnesota, $5 for me, subject to the foregoing terms and conditions, which are agreed to.

"$5.00.	C. C. JONES."

At the time the money was paid by Jones, and the above receipt given, he was directed to return to the office and receive his money at the odds mentioned, if the horse won. The horse did not win, and the receipt remained in the possession of Jones.

Business of the above character was practically all the business transacted at the office of the Mercantile Telegraph Company, and as many as two hundred and seventy-five messages of the kind in question were sent on one day. No settlement of accounts with the St. Paul office, or with F. N. Shaw, was shown, and, as far as any inference arose from the testimony, no such settlement was ever had; and the money received at the St. Louis office, as aforesaid, was employed in paying winners at said office.

This being in substance all the evidence bearing upon the question, we must conclude that it was sufficient to make out a *prima facie* case against the defendant. The fact that the information touching these races passed through the defendant's office, and that he himself pointed out to Jones how to bet money on a horse, merely requesting him to select the horse from the blackboard, is sufficient *prima facie* evidence against the defendant that the race did take place at Guttenberg, New Jersey, and that a horse named Matagorda was one of the entries. The fact that a large number of these telegrams and orders were received up to the very time when the horses were at the post, and that the bets were paid shortly, if not immediately, after

the result of the race was declared, with the additional fact that no settlement is shown to have taken place in the course of several months between the St. Paul and St. Louis offices, justifies the inference that the defendant was a mere custodian of the money until the result of the race was ascertained, and that the messages and money orders sent, if sent, were a mere blind to cover up the true nature of the transaction, and to avoid the severe penalties of the law. The conclusion, that this transaction was a mere "bookmaking" on a race beyond the limits of this state, seems from all the evidence morally certain; and the inference that it was such is legally admissible. Whether the backer in the transaction was F. N. Shaw, or whether F. N. Shaw himself was a mere blind, and the backers were other parties undisclosed, seems to us immaterial for the purposes of justice. It is important in the administration of justice to guard on the one hand against the conviction of persons upon bare suspicion, under the pressure of popular clamor, and on the other hand against permitting them to escape punishment by resorting to ingenious devices in defeating salutary statutory provisions.

With the concurrence of all the judges, the judgment is affirmed