## STATE v. PERCELLE DOWNEY

### (Filed 23 November, 1960.)

**1. Homicide § 1—**

Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation; murder in the second degree is the unlawful killing of a human being with malice, but without premeditation and deliberation; manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation.

**2. Homicide § 13—**

Admission and proof tending to show an intentional killing of a human being with a deadly weapon raise the presumption of malice, constituting the offense of murder in the second degree and placing the burden upon defendant to show to the satisfaction of the jury matters in mitigation or excuse.

**3. Homicide § 20—**

Admission and proof tending to show that defendant intentionally shot deceased, inflicting fatal injury, precludes nonsuit.

**4. Criminal Law § 46—**

Flight by defendant after the crime had been committed is competent to be considered in connection with other circumstances upon the question of guilt.

**5. Criminal Law § 99—**

Upon motion to nonsuit, the evidence is to be considered in the light most favorable to the State. G.S. 15-173.

**6. Criminal Law § 85—**

Where the State introduces in evidence testimony of a statement by defendant, the statement is presented as worthy of belief, and warrants nonsuit if the statement is not contradicted and is wholly exculpatory,

but the State, by introducing such statement, is not precluded from showing that the facts were otherwise.

**7. Homicide § 20—**

The introduction in evidence by the State of a statement of defendant that he shot deceased in self-defense as deceased was coming on him with a pocket knife, does not warrant nonsuit when the State also introduces other evidence, including evidence of the absence of powder burns on the body of deceased, that the knife found at the scene was unopened, etc., tending to show that the killing was not in self-defense, since in such instance the State's evidence does not establish self-defense as a matter of law.

**8. Criminal Law § 126—**

A motion to set aside the verdict as contrary to the weight of the evidence is addressed to the sound discretion of the trial court, and the refusal of the motion is not subject to review on appeal.

**9. Criminal Law § 131—**

A sentence within the limitations prescribed by statute cannot be held cruel or unusual in the constitutional sense. Art. I, § 14, of the State Constitution.

**10. Criminal Law § 160—**

The burden is upon appellant to show error amounting to a denial of some substantial right in order to entitle him to a new trial.

APPEAL by defendant from *McKinnon, J.,* at June 1960 Term, of WARREN.

Criminal prosecution upon a bill of indictment in which the defendant is charged with the offense of murder in the first degree of one John Edward Ball. At the outset of the trial the Solicitor for the State announced that it would not seek a conviction upon that charge, but would seek a conviction upon the charge of murder in the second degree or manslaughter as the evidence might warrant.

To the bill of indictment defendant pleaded not guilty.

And it was stipulated and agreed by the defendant through his counsel and the Solicitor for the State that John Edward Ball came to his death as a result of a .22 bullet wound in the head inflicted on or about the 19th day of December, 1959.

Upon trial in Superior Court the State offered evidence tending to show the factual situation surrounding and relating to death of John Edward Ball.

From the stipulation hereinabove related and the testimony offered upon the trial in Superior Court by the State, it is undisputed that one John Edward Ball came to his death as the result of a

.22 bullet wound in the head inflicted upon him on or about the 19th day of December, 1959.

In this respect Sheriff James H. Hundley of Warren County testified in pertinent part substantially as follows: " * * * In response to a call I received from the Oine Community, about 11:30 on the night of December 19, 1959, I went to the Norlina-Oine public road * * * I saw a man laying in the road. His head was just across the center line and his feet back up on the left side of the center line * * * flat on his back * * * The first thing I did * * * was to call an ambulance * * * While I was waiting for the ambulance the father of the deceased, John Ball, and his wife came up to where the deceased was * * * Mr. Paynter, who runs a store nearby, and Freeman Cleaton were also there * * * Upon arrival the operators of the ambulance picked up the man * * * and carried him to the Warren Hospital * * * I did not see the defendant that night, but I saw him the next morning at his home. * * * I had with me one of my deputies, Mr. Stevenson. At that time I arrested the defendant and his brother. The defendant told me that it wasn't necessary to take his brother in because he (defendant) was the one that did the shooting. The defendant told me that he used a sawed-off .22 rifle and that he gave the rifle to a boy, called him 'Peanut' and that they threw it from the bridge over Smith's Creek, that they stopped there on the bridge and threw it in the creek. As a result of that information, I went back to this particular bridge several times and searched for the rifle * * * I found the rifle almost in the exact spot the defendant pointed out to me when he stood on the bridge * * * There was one empty cartridge in it * * * This is the cartridge." (The gun and cartridge were offered in evidence by the State.)

And the Sheriff continued: "At the time I examined the body of the deceased I did not observe any powder burns around the site of the wound."

Upon cross-examination the Sheriff further testified in pertinent part: " * * * One of his (John Edward Ball's) hands was stretched out and the other one was laying down. The right * * * close to his body. In his right hand I found a pocket knife * * * At the time I found the knife it was closed * * * ." And the Sheriff continued: "At the time of the arrest of the defendant, the defendant told me that he and the deceased, John Edward Ball, had had some argument, that John wanted the defendant to take him home right at the turn going to John's house, and they got in an argument because he wouldn't take him all the way to his house. The defendant later told me that the deceased, John Edward Ball, had the rifle

out at the rear of the car in which they were riding and that the deceased shot it up in the air * * * ."

And the Sheriff further testified: "At the time of my first conversation with the defendant, he told me that he shot the deceased in self-defense as the deceased was coming on him with a pocket knife. I found a knife in deceased's hand or thereabouts. His hand was not closed tight. The defendant told me that the deceased got the rifle and wanted to shoot it, said he wanted to shoot toward's Mr. Rooker's house, but he did not tell me that at the time I picked him up. It was probably an hour or so later * * * ."

On recall the Sheriff testified briefly as follows: " * * * I asked him (the defendant) why he shot him and left there, and he told me that he just got scared and got in the car and drove back to Norlina, went on to Wise, came back and threw his gun in the creek and went home * * * ." And in response to the question "How far, in your opinion, was the body of the deceased from the defendant's home?" the Sheriff replied: "It was probably a mile or a mile and a half, I would say. I would say that the distance of the route traveled by the defendant following the shooting to his home would be probably ten miles, eight to ten miles * * * ." And the Sheriff concluded his testimony by saying: "At the time this statement of the defendant was made to me * * * I had with me one of my deputies * * * also present was a brother of the defendant * * * At the time the defendant was in my car, we were taking him back to jail. * * * I asked him where the gun was. He did not hesitate to tell me, nor did he hesitate to tell me where he went after the shooting."

The State offered as witnesses John Ball and Hattie Ball, father and mother of Ed Ball, deceased. John Ball testified: " * * * John Ed Ball * * * at the time of his death, was twenty years old. He lived in my home. I have never seen this knife that the Sheriff testified he found in the hand of my son. I do not know whether he owned a knife or not, but I have never seen him with one. I went to the place where the body of my son was found on the night of December 19th. When I arrived at the scene * * * in an effort to ascertain whether or not the deceased was hurt, I only looked at his head, he was bleeding, up there was a hole in his head, blood was running * * * back * * * . I did not know whether he was dead or not. He was unconscious, and said nothing. My wife was with me at the time * * * The ambulance took my son to Warrenton to the hospital and he stayed there until Sunday night around 8 o'clock. He was shot on Saturday night * * * My son was taken to Duke Hospital. I was not with him at the time of his death. On

the following morning I went back to the scene of the shooting, walking around looking. From my turn going on the highway I tracked some blood on the edge of the highway * * * about 20 feet from where he was laying, some drops of blood right on the edge of the highway * * * My house is about * * * 500 feet or less from the place on the road where I saw the body of my son."

Hattie Ball, mother of deceased, testifying as witness for the State, said: " * * * When I got to where my son was laying, he was laying with his hand close down beside him and the left hand in his pocket. I didn't see any knife * * * I saw he was not dead * * * I have never seen this knife before, because he didn't even carry any knife. He lived in my home * * * ."

The State also offered testimony of Allen Curry in pertinent part as follows: "I am twenty years old * * * I remember the night that John Edward Ball was shot. Neither I nor John Edward Ball nor Percelle Downey did anything just before the shooting. I do not know what they did. I was with them. I do not know how long I had been with them before the shot was fired. We were going home and we had been to the Wayside Inn at Wise. That is not on the same road that John Edward Ball lived on. I was not present when the shot was fired. I left the car when they started arguing * * * I left * * * right there at John Edward Ball's turn. I got out because I thought they were going to have some argument there and somebody might call the law. I do not know what they were arguing about. I did not see any gun in the car anywhere. I have seen this gun * * * I saw it in the home of Percelle Downey * * * After I got out of the car, I came on down the road when I got out * * * there was someone else in the car * * * John Edward Ball was * * * standing on the ground. I think Percelle Downey got out * * * Roy Lee Downey was driving * * * After I left the car I did not hear anything * * * I did not say anything when I left the car * * * I came on down the new road. A shot was fired, or I heard something * * * When I heard the noise I reckon the car was up there at the turn * * * I trotted on down the road * * * A car came on down the road. I took it to be it. It came on down the road behind me * * * I never looked back any more * * *."

And Manson Green, funeral director, testified: "On the night of December 19, 1959, I visited the spot on the Norlina-Oine Road where the body of John Edward Ball was located. I saw the body—lying across the road. His head was on the center line. We didn't examine it so much, but he had a hole right up here * * * After that at the hospital I examined him again under the lights. It look-

ed like he had a gash up here like he had been stabbed. That is the way it looked to me. * * * I observed no powder burns on the face of the deceased. Later we took him to Duke Hospital. John Edward Ball died and my funeral home handled the body."

Defendant offered no evidence and moved for judgment as of nonsuit when the State rested. The motion was denied, and the case was submitted to the jury upon the evidence offered and the stipulation above recited, and under the charge of the court.

The jury returned a verdict of guilty of murder in the second degree. Whereupon the court rendered judgment that the defendant be confined in the State Prison for not less than fifteen nor more than twenty years.

Defendant excepts thereto and appeals to Supreme Court, and assigns error.

*Attorney General Bruton, Assistant Attorneys General H. Horton Rountree and Glenn L. Hooper, Jr., for the State.*
*John Kerr, Jr., for defendant, appellant.*

WINBORNE, C. J. The first question presented by the defendant as the main question is whether or not the trial court erred in refusing to grant defendant's motion for judgment as of nonsuit. In this connection the defendant pleads self-defense, and contends that the evidence offered by the State exculpates him on this plea.

Taking the evidence and the facts stipulated in the light most favorable to the State, the conclusion does not follow as a matter of law.

In this connection it is appropriate to note: (1) Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. (2) Murder in the second degree is the unlawful killing of a human being with malice, but without premeditation and deliberation. And (3) manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation.

Moreover, it is well established in this State that the intentional killing of a human being with a deadly weapon implies malice, and, if nothing else appears, constitutes murder in the second degree. And when this implication is raised by an admission or proof of the fact of an intentional killing, the burden is on the defendant to show to the satisfaction of the jury facts and circumstances sufficient to reduce the homicide to manslaughter or to excuse it. See *S. v. Utley,* 223 N.C. 39, 25 S.E. 2d 195, and cases cited. Hence motion to non-

suit is not tenable. See *S. v. Vaden*, 226 N.C. 138, 36 S.E. 2d 913; *S. v. Brooks*, 228 N.C. 68, 44 S.E. 2d 482; *S. v. Artis*, 233 N.C. 348, 64 S.E. 2d 183; *S. v. Brannon*, 234 N.C. 474, 67 S.E. 2d 633.

Indeed there is evidence of flight by defendant after the shooting of deceased. This is competent to be considered by the jury in connection with other circumstances in passing upon the question of guilt. See *S. v. Payne*, 213 N.C. 719, 197 S.E. 573, and cases cited. Also *S. v. Peterson*, 228 N.C. 736, 46 S.E. 2d 852.

Moreover, when the sufficiency of the evidence offered on the trial in Superior Court is challenged by motion for judgment as of nonsuit under G.S. 15-173, the evidence is to be taken in the light most favorable to the State.

Nevertheless, when the State, as in the case in hand, has introduced in evidence the statement of defendant, the statement is presented as worthy of belief. And when such statement tends to exculpate defendant, he is entitled to whatever advantage it affords, even to an acquittal when it is wholly exculpatory. However, the State by offering the statement of defendant is not precluded from showing that the facts were different. See *S. v. Simmons*, 240 N.C. 780, 83 S.E. 2d 904, and cases cited.

Defendant also presents for decision on this appeal question as to whether the trial court erred in refusing to set the verdict aside as being against the greater weight of the evidence. This is without merit for that in North Carolina a motion to set aside a verdict as contrary to the weight of the evidence is addressed to the sound discretion of the trial court, and the refusal of the court to grant same is not subject to review on appeal. See *S. v. Chapman*, 221 N.C. 157, 19 S.E. 2d 250; *S. v. Reddick*, 222 N.C. 520, 23 S.E. 2d 909.

Defendant also presents question in brief filed on this appeal whether under the evidence in this case sentence imposed upon the defendant, that is, a term of from fifteen to twenty years in State Prison, is excessive and oppressive, and an infliction of cruel or unusual punishment within the meaning of Art. 1, Sec. 14, of the State Constitution.

But when a person is convicted of murder in the second degree the punishment prescribed by statute, G.S. 14-17, is imprisonment in the State Prison for not less than two years nor more than thirty years.

In this connection this Court has held uniformly that a sentence is not excessive or cruel or unusual when within the limits prescribed by the Legislature. It is within the discretion of the judge, and not subject to review on appeal. *S. v. Woodlief*, 172 N.C. 885, 90 S.E.

137; *S. v. Fleming,* 202 N.C. 512, 163 S.E. 453; *S. v. Brackett,* 218 N.C. 369, 11 S.E. 2d 146; *S. v. Daniels,* 197 N.C. 285, 148 S.E. 244.

Indeed this headnote in *S. v. Wilson,* 218 N.C. 769, 12 S.E. 2d 654, epitomizes the holdings of this Court in this manner: "When a statute prescribing the punishment for a statutory offense fixes limitations upon the severity of the punishment, the court has discretionary power to fix the punishment within the limitations prescribed, and a sentence of imprisonment for the maximum period allowed by the statute cannot be held excessive or in violation of the constitutional rights of defendant."

Other exceptions shown in the record of case on appeal have been given due consideration, and in them error is not made to appear.

It is a well settled rule in North Carolina that the burden is upon the appellant to show prejudicial error amounting to a denial of some substantial right and in the absence of such showing there is no reversible error. *Kennedy v. James,* 252 N.C. 434.

Therefore since error in the trial court is not made to appear, there is

No error.