## STATE OF NORTH CAROLINA v. FERRELL ROBBINS
### No. 3

(Filed 15 October 1969)

**1. Homicide § 4— first-degree murder — elements**

Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation.

**2. Homicide § 4— first-degree murder — intent to kill**

A specific intent to kill is a necessary constituent of the elements of premeditation and deliberation in first-degree murder.

**3. Criminal Law § 176— review of judgment on motion to nonsuit — consideration of evidence**

Where defendant offered evidence after his motion for judgment as of nonsuit at the close of the State's evidence, the Court on appeal will consider only the denial of the motion made at the close of all the evidence, and the Court must act in light of all the evidence. G.S. 15-173.

**4. Homicide § 21— nonsuit motion — premeditation and deliberation — sufficiency of evidence**

Defendant's motion for judgment as of nonsuit in a homicide prosecution presents the question of whether the State has presented substantial evidence —circumstantial, direct, or both — that defendant acted with premeditation and deliberation.

**5. Homicide § 21— first-degree murder — premeditation and deliberation — nonsuit**

In prosecution charging defendant with the first-degree murder of his wife, there was substantial evidence of premeditation and deliberation on the part of defendant to withstand motion for nonsuit.

**6. Constitutional Law § 21— right to security in the home — search warrant**

The Fourth Amendment to the U. S. Constitution and Art. I, § 15, of the N. C. Constitution guarantee that, in ordinary circumstances, even the strong arm of the law cannot invade the home except under authority of a search warrant issued in accordance with statutory provisions.

**7. Criminal Law § 84— evidence obtained by illegal search — competency**

Evidence obtained by an illegal search without a search warrant is inadmissible. G.S. 15-27.

**8. Searches and Seizures § 1; Criminal Law § 84— warrantless search — test of unreasonableness**

The constitutional rights of a defendant are not violated by a warrantless search unless the search is unreasonable.

**9. Searches and Seizures § 1— reasonableness of search**

The reasonableness of the search must be determined by the court from the facts and circumstances of each individual case.

**10. Searches and Seizures § 1— what constitutes unreasonable search**

An unreasonable search is an examination or inspection without authority of law of one's premises or person with a view to the discovery of some evidence of guilt to be used in a criminal prosecution.

**11. Searches and Seizures § 1; Criminal Law § 84— entry into defendant's home without warrant — crime scene — admissibility of testimony**

In a prosecution charging defendant with the first-degree murder of his wife, a deputy sheriff's entry into defendant's home without a warrant was lawful, and consequently his testimony relating to the view of the crime scene inside the home was properly admitted in evidence, where the officer, unaware of the existence of any crime, entered the dwelling at the request of defendant's brothers who feared that harm had come to their brother and sister-in-law.

**12. Criminal Law §§ 73, 77— admission by defendant — testimony of officer — hearsay rule**

Testimony by police officer as to a conversation he overheard between defendant and his niece in which defendant admitted his guilt of murdering his wife and stated his motive in doing so, *is held* admissible, the testimony not being in violation of the hearsay rule since its probative force did not depend upon the competency or credibility of any person other than the officer.

**13. Criminal Law § 77— competency of admissions**

Admissions of fact by a defendant pertinent to the issue which tend to prove his guilt of the offense charged are competent against him.

**14. Criminal Law §§ 99, 170— conduct of trial — leading questions by trial court — voir dire**

Trial court did not err in asking deputy sheriff leading questions on a *voir dire* hearing in the absence of the jury.

**15. Criminal Law § 99— conduct of trial — questions by trial court**

The trial court may propound competent questions to a witness in order to develop some relevant fact which had been overlooked.

**16. Criminal Law § 73— testimony of assertions of third person — admissibility — voir dire hearing**

Testimony by deputy sheriff as to statements of jailer over the telephone that there was trouble at defendant's home and that defendant's brothers were worried *is held* properly admitted on *voir dire* hearing in the absence of the jury, since the testimony was in explanation of why the officer went to defendant's home.

**17. Criminal Law § 169— admission of evidence — harmless error**

The admission of testimony over objection is ordinarily rendered harmless when defendant elicits similar testimony on cross-examination or introduces similar testimony himself.

**18. Homicide § 25— instructions — first-degree murder — definition of "malice"**

Where the trial court in first-degree murder prosecution correctly de-

fined the term "malice" before it reached the charge on murder in the first degree, the court was not required to repeat the definition of "malice" in its instructions on the elements of the offense.

**19. Criminal Law § 113— instructions — repetition of the definition of a word**

Where the trial court correctly defines a word in its charge to the jury, the court is not required to repeat the definition each time the word is repeated in the charge.

APPEAL by defendant from *Martin, J.,* at November Session 1969, RUTHERFORD Superior Court.

After selection of the jury and before the State called its first witness, the defendant moved to suppress the State's evidence on the ground that it was secured by an unlawful search. The court then conducted a voir dire hearing to determine the admissibility of the testimony of Officer Russell Duncan. On voir dire Officer Duncan testified that on the morning of 5 May 1968 he was employed as a Deputy Sheriff of Rutherford County; that at approximately 9:15 A.M. on that date he went to the house of defendant, at the request of defendant's brothers, Elmer and Vernon Robbins, pursuant to a message relayed to him from the Sheriff of Rutherford County. Upon arriving at defendant's house, the officer stated that the brothers told him the following:

"They stated that they received a telephone call earlier —
"— earlier; that it was from Ferrell, but they couldn't understand what he was saying; that they was worried that something was wrong. . . .

"They wanted to get in. They wanted to get in and find out what was wrong. In order to get into the house, I tried to pull the screen open by the handle, but I couldn't. So I took my knife and cut the screen . . . unlocked the screen . . . opened it . . . got hold of the door handle and tried to open the door . . . couldn't get it open . . . tried to kick the door down and I couldn't."

The officer then testified that one of the brothers brought him an iron bar which he used to break out a panel of glass in the door, so that he could reach inside the house, unlock the door, and gain entry into the house. Before entering the house, the officer said that he called as loud as he could to see if anyone would answer. He called for Mr. Ferrell Robbins and "hollered" and beat on the door and the window without receiving any answer. He further testified:

"I figured something was wrong in the house, because the door

was locked from the inside and nobody could have left and locked the screen from the inside and the door was locked from the inside and I figured there was somebody in there. Mr. Ferrell Robbins' car was parked in the yard."

". . . I entered to find out what was wrong in the house, because they didn't answer. I wasn't searching the house, no."

". . . The brothers are the ones who wanted me to go, the sheriff sent me but at the brother's request. The man who talked to me on the telephone didn't say anything about a felony being committed. . . ."

The witness stated that upon entering the house he found the deceased, Beatrice Robbins, and defendant lying together on the floor near the front door. Mrs. Robbins was not breathing. He heard a gurgling sound and discovered that defendant was still alive. He found a rifle at the feet of defendant and several apparent bullet holes in the body of the deceased.

Vernon Robbins, a brother of defendant, testified that in response to a telephone call from defendant he went to defendant's house. On the way he picked up another brother, Elmer. They arrived at approximately 8:00 o'clock A.M. and could not get into the house, and observed defendant's car was parked in front of the house. Vernon testified:

"We stayed over at my brother's house five or ten minutes before we went over to the jail. He was in bad shape and had been all the time. I was concerned about him. I just wanted an officer to go in there and see what was wrong."

At the conclusion of the voir dire hearing, the trial judge made full findings of fact and conclusions of law and held "that the testimony of the witness Russell Duncan, is competent and admissible in the trial of this case, insofar as the objection to such testimony is concerned for violating of the search and seizure rule." Thereupon the State offered its first witness, Officer Russell Duncan, in the presence of the jury, and he substantially reiterated his voir dire testimony.

The State offered Sheriff Damon Huskey as a witness. The court again conducted a voir dire hearing to determine whether or not the statements made by defendant to the Sheriff would be admissible. On such hearing the Sheriff testified that he went to the hospital room of defendant and upon arrival defendant asked how his wife was getting along. The Sheriff told him that she was dead, and that he was under arrest for murder. The Sheriff then "advised him of

STATE *v.* ROBBINS

his rights" as approved by *Miranda v. Arizona,* 384 U.S. 436. When the jury returned to the courtroom, the Sheriff merely testified as to wounds he observed on defendant. However, when the Sheriff was recalled for examination, defendant's attorney elicited testimony before the jury as to the conversation between himself and defendant in which defendant said he shot her "because she was going to leave, because her daughter wanted her to go with them down east somewhere." He also testified about a statement he made to defendant's deceased wife to the effect that she should pack up her belongings and leave the county.

State's witness Mrs. Nell Bridges stated that on 4 May 1968 she and Jackie Brandle and decedent went to the Robbins' house to get some clothes. As they started to leave, Robbins took hold of his wife's arm and said, "I just want her to stay one hour and I will bring her." Deceased remained with her husband.

At the close of State's evidence, defendant moved for a judgment as of nonsuit on the first degree charge. Which was denied.

Defendant offered evidence which tended to show that prior to 5 May 1968 he had been upset and despondent. Dr. Ernest Yelton said he had sent defendant to the hospital "to get him off whiskey." He identified Defendant's Exhibit 1 as being Librium 25 mil. capsules.

Dr. Laczko, an expert in psychiatry, testified that defendant was admitted to Dorothea Dix Hospital on 15 May 1968 and remained there under his care until his discharge on 1 July 1968. He stated that defendant was competent to return to court for trial, and that he knew right from wrong. He had no opinion as to whether defendant knew it was wrong to kill his wife as of 5 May 1968.

Defendant offered other evidence which tended to show that on 5 May 1968 he was under the influence of a combination of Librium and whiskey, which caused a clouded consciousness, impaired judgment and impaired memory. Defendant testified and denied any memory of the events of 5 May 1968. He stated that he did not remember having killed his wife and had no memory of any discussions with anyone in which he had admitted killing his wife or making any pact with her in reference thereto.

Dean Sheehan, a special deputy assigned to guard defendant's room, testified that in a discussion with defendant, defendant told him that he shot his wife as a result of a suicide pact.

The jury returned a verdict of guilty of first degree murder with the recommendation that his punishment be imprisonment for life.

Judgment was entered on the verdict, and defendant gave notice of appeal. Appeal was not perfected within the time allowed by the trial court. Defendant's attorneys petitioned that a writ of certiorari issue allowing him to perfect his appeal. This petition was allowed by order of this Court dated 17 February 1969.

*Attorney General Morgan and Deputy Attorney General Moody for the State.*

*J. Nat Hamrick for defendant.*

BRANCH, J.

Defendant moved for judgment as of nonsuit on the first degree murder charge at the conclusion of the State's evidence and at the close of all the evidence. He assigns as error the failure of the court to grant his motions.

[1, 2] Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. A specific intent to kill is a necessary constituent of the elements of premeditation and deliberation in first degree murder. *State v. Downey,* 253 N.C. 348, 117 S.E. 2d 39; *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560.

In *State v. Buffkin,* 209 N.C. 117, 183 S.E. 543, it is stated:

> "Premeditation means thought over beforehand for some length of time, however short, but no particular time is required for the mental process of premeditation. Deliberation means revolving over in the mind. A deliberate act is one done in a cool state of the blood in furtherance of some fixed design."

[3] Since defendant offered evidence after his motion for judgment as of nonsuit at the close of the State's evidence, we consider only the denial of the motion made at the close of all the evidence, and we must act in light of all the evidence. *State v. Leggett,* 255 N.C. 358, 121 S.E. 2d 533; *State v. Norton,* 222 N.C. 418, 23 S.E. 2d 301; G.S. 15-173.

[4] Defendant's motion for judgment as of nonsuit presented the question of whether the State had presented substantial evidence — circumstantial, direct, or both — that defendant acted with premeditation and deliberation. We must take the evidence in the light most favorable to the State when considering this question. *State v. Bogan,* 266 N.C. 99, 145 S.E. 2d 374; *State v. Stephens,* 244 N.C. 380, 93 S.E. 2d 431.

In connection with this assignment of error we quote the following testimony:

Defendant's witness Dean Sheehan: "Mr. Robbins told me they made an agreement. That they were in trouble and couldn't get along, and if he would promise to kill himself, she would let him kill her and kill himself, and said she started to walk toward the front door and turned around and he shot her."

State's witness Oris Bridges: ". . . (T)he telephone rang and it was Ferrell Robbins. He called me and said I know where she (deceased wife) is and how she got there. He said, 'she will be sorry of this, in fact, the whole family will be sorry and I do mean sorry.' "

State's witness Damon Huskey: "Ferrell Robbins told me, 'I shot my wife, how is she getting along.' I told him I was sorry. He said, 'Well, I'm not, she is better off, and I would do it again, and you will never try me, I will kill myself.' I told him I was arresting him for murder. When I asked how come you shot her, Ferrell Robbins said because she was going to leave, because her daughter wanted her to go with them down east somewhere, Charlotte or somewhere."

[5]  We think this testimony, when considered with all the evidence, discloses facts which constitute substantial evidence of premeditation and deliberation on the part of defendant. Thus, the trial court properly overruled defendant's motion for judgment as of nonsuit.

Defendant contends that the court erred in failing to suppress the testimony of Deputy Sheriff Russell Duncan as being the product of an illegal search and seizure, in violation of Art. 1, § 15, of the North Carolina Constitution and the Fourth Amendment to the United States Constitution.

[6, 7]  The Fourth Amendment to the United States Constitution and Art. I, § 15, of the North Carolina Constitution guarantee that, in ordinary circumstances, even the strong arm of the law cannot invade the home except under authority of a search warrant issued in accord with statutory provisions, *In re Walters*, 229 N.C. 111, 47 S.E. 2d 709, and evidence obtained by an illegal search without a search warrant is inadmissible. G.S. 15-27. *State v. Smith*, 242 N.C. 297, 87 S.E. 2d 593; *Mapp v. Ohio*, 367 U.S. 643, 6 L. ed 2d 1081.

[8, 9]  The constitutional rights of a defendant are not violated by a warrantless search unless the search is unreasonable. *State v. Colson*, 274 N.C. 295, 163 S.E. 2d 376; *District of Columbia v. Little*, 339 U.S. 1, 94 L. ed. 599. The reasonableness of the search must be

determined by the court from the facts and circumstances of each individual case. *State v. Howard,* 274 N.C. 186, 162 S.E. 2d 495; *Berger v. New York,* 388 U.S. 41, 18 L. ed 2d 1040.

[10] This Court has defined an unreasonable search to be " 'an examination or inspection without authority of law of one's premises or person, with a view to the discovery of . . . some evidence of guilt, to be used in the prosecution of a criminal action.' 47 Am. Jur., Searches and Seizures § 52." *State v. Colson, supra.*

The United States Supreme Court considered this question in the case of *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 18 L. ed. 2d 782. There, the police entered respondent's home with his wife's permission minutes after being informed that an armed robbery had occurred and that the suspect had entered respondent's house. Respondent was in the house feigning sleep. He was arrested and the officers, without a search warrant, found damaging evidence which was introduced at his trial. The Supreme Court, in holding the entry and search valid, stated:

> "We agree with the Court of Appeals that neither the entry without warrant to search for the robber, nor the search for him without warrant was invalid. Under the circumstances of this case, 'the exigencies of the situation made that course imperative.' *McDonald v. United States,* 335 U.S. 451, 456. The police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it. They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential. . . ."

In the case of *State v. Howard, supra,* Justice Sharp, speaking for the Court, stated:

> ". . . If the officers' presence was lawful, the observation and seizure of what was then and there apparent could not in itself be unlawful. *Harris v. United States, supra; Ker v. California,* 374 U.S. 23, 83 S. Ct. 1623, 10 L. ed. 2d 726; *United States v. Horton,* 328 F. 2d 132 (3rd Cir.)

> "Neither the Fourth Amendment nor G.S. 15-27 is applicable where no search is made. The law does not prohibit a seizure without a warrant by an officer in the discharge of his

official duties where the article seized is in plain view. *State v. Craddock,* 272 N.C. 160, 158 S.E. 2d 25; *State v. Kinley,* 270 N.C. 296, 154 S.E. 2d 95; *State v. Bell,* 270 N.C. 25, 153 S.E. 2d 741; *State v. Giles,* 254 N.C. 499, 119 S.E. 2d 394; *Ker v. California, supra; Harris v. United States, supra.*"

**[11]**  In the instant case the officer was not engaged in a search for evidence to be used in a criminal prosecution. He entered defendant's dwelling at the request of defendant's brothers, who were very apprehensive and worried about defendant. Under the present law the officer would not have had any basis to request a search warrant since he could not allege a particular object which he sought. *State v. Bullard,* 267 N.C. 599, 148 S.E. 2d 565. He was simply lending the strong arm of the law to a distressed family who feared that harm had come to their brother and sister-in-law. The officer's presence was lawful and his testimony as to things in plain view was properly admitted into evidence.

For the same reasons stated above, defendant's objections to admission of State's Exhibits, discovered as a result of Deputy Duncan's entry into defendant's house, are overruled.

**[12]**  Defendant assigns as error the action of the court in allowing the witness Oris Bridges to testify to a conversation which he allegedly heard between defendant and his niece, Jackie Brandle, as being in violation of the hearsay rule. The pertinent portion of this testimony was as follows:

"Jackie walked up to the bed and told Ferrell—

MR. MAHONEY:  Objection

COURT:  Overruled.

EXCEPTION NO. 105

A.  — that the funeral home was ready for some clothing and we wanted some clothing and Ferrell said—

MR. MAHONEY:  Objection to what Ferrell said.

COURT:  Overruled.

EXCEPTION NO. 106.

A.  — they were in storage and one of his brothers would get them for us, and Jackie said—

MR. MAHONEY:  Objection to what Jackie said.

COURT:  Overruled.  EXCEPTION NO. 107.

A.  — Jackie Brandle, my niece asked Ferrell if he had any insurance and he said—

OBJECTION OVERRULED EXCEPTION NO. 108

A. — he said 'You've got the insurance in Raleigh,' and Jackie said 'Why did you do this?"

MR. MAHONEY: Objection, if your Honor please.

COURT: Overruled.

EXCEPTION NO. 109.

A. — and he says, 'I killed her and I'm not a bit sorry of it, because she was mine. She was going to leave me and go with you and I killed her and I'm not a bit sorry of it.'

Q. Then what did she ask about her mother?

A. Jackie said, 'Ferrell, how long did you make my mother suffer?

MR. MAHONEY: Objection now.

COURT: Overruled.

EXCEPTION NO. 110.

A. He was lying on his back and he put kind of shrugged his shoulders and raised his hands up off the bed and says, 'Oh, just a few seconds. It was all over within just a few seconds.' "

We note, parenthetically, that defendant offered testimony of one Dallas Aerial, the guard assigned to defendant, to the effect that he was present when defendant talked with Jackie Brandle and that he never heard the statements which defendant allegedly made to her.

[13] It is well settled law in this jurisdiction that in a criminal prosecution admissions of fact by a defendant pertinent to the issue which tend to prove his guilt of the offense charged are competent against him. *State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10; *State v. Woolard,* 260 N.C. 133, 132 S.E. 2d 364; *State v. Abernethy,* 220 N.C. 226, 17 S.E. 2d 25; *State v. Lawhorn,* 88 N.C. 634.

The case of *State v. Hopkins,* 154 N.C. 622, 70 S.E. 394, is factually similar to the instant case. There, a police officer was allowed to testify to a conversation he overheard between one Streeter and the defendant, which tended to establish the guilt of the defendant upon an indictment charging unlawful sale of liquor. Holding the evidence competent, the Court stated:

"Such evidence does not constitute *the ex parte* declaration of Streeter, as contended, but it is competent because it is a conversation of the defendant with Streeter and tends to prove the guilt of the accused by his own declarations."

**[12]** In support of his contention that this evidence is barred by the hearsay rule, defendant quotes from Stansbury, North Carolina Evidence, § 138, at 335, as follows:

"Evidence, oral or written, is called hearsay when its probative force depends, in whole or in part, upon the competency and credibility of some person other than the witness by whom it is sought to produce it."

We agree that this is a correct statement of the law; however, defendant can find no comfort in this definition, since the probative force of the evidence did not depend upon the competency or credibility of some person other than the witness. Here, the witness testified as to what he actually heard defendant say.

Defendant also cites the case of *Jones v. Bailey,* 246 N.C. 599, 99 S.E. 2d 768, as authority to support this contention. *Jones v. Bailey* was a civil action in which plaintiff sought to testify as to statements made by a police officer in answer to an inquiry by defendant. The answer given by the police officer tended to establish relevant facts against defendant. The Court held this evidence inadmissible. However, *Jones v. Bailey* is distinguishable from the instant case because the statements of fact offered against the defendant were not made by the defendant.

The testimony here offered tended to establish motive on the part of defendant to commit the crime and to otherwise establish his guilt. We therefore hold that the admissions made by defendant were properly admitted into evidence. Neither was the admission of the questions contained in the colloquy between Jackie Brandle and defendant erroneous. The questions were necessary to make the purported admissions intelligible.

**[14]** We next consider the question of whether the trial court committed prejudicial error by asking Deputy Sheriff Duncan leading questions when he was examined on a voir dire hearing in absence of the jury. The trial judge, *inter alia,* questioned the officer as follows:

"In other words, in addition to the duties of your office to arrest persons accused of crime and investigate the violation of the criminal laws, your office also has the duty and undertakes to carry out the duty of protecting the lives of the citizens of Rutherford County and other people in Rutherford County when the violations of the criminal law are not involved.

A.   Yes Sir.

EXCEPTION NO. 19

COURT: And it was in the performance of this duty that you first entered into the home of Ferrell Robbins?

A. Yes Sir.

EXCEPTION NO. 20.

[14, 15] Had the jury been present, the trial judge would have been justified in propounding competent questions in order to develop some relevant fact which had been overlooked. *State v. Kirby,* 273 N.C. 306, 160 S.E. 2d 24. *A fortiori,* the trial judge was justified in asking such questions in the jury's absence, even though the questions may not have been properly framed. None of the evidence was ever before the jury. See *State v. Pressley,* 266 N.C. 578, 146 S.E. 2d 824.

[16] On the same voir dire hearing, in the absence of the jury, Officer Duncan testified, in part:

"COURT: Did you get a radio message, Mr. Duncan, to go to the Robbins' house?

EXCEPTION NO. 29.

A. No, sir, I got a telephone call.

COURT: Who was it from?

EXCEPTION NO. 30

A. The jailer. He said that his brothers were at the jail and concerned about their brother and the sheriff said for me to go down there. The brothers are the ones who wanted me to go, the sheriff sent me but at the brothers' request. The man who talked to me on the telephone didn't say anything about a felony being committed he said there was trouble. That they were concerned about their brother and they couldn't get in and that there was some trouble in the house and they were worried."

In 2 N.C. Index 2d, Criminal Law, § 73, at 573, we find the following:

"While testimony of extrajudicial assertions of a third person is incompetent to prove the truth of the facts asserted by such person, the hearsay rule does not preclude testimony of such assertions for the purpose of showing the state of mind of the witness in consequence of such assertions and not for the purpose of proving the matters asserted."

Clearly the challenged testimony was elicited so that the trial judge could determine why the witness acted as he did. The state-

ment of the jailer proved no relevant facts. Again, this testimony was not before the jury and the content of the testimony was not harmful or prejudicial to defendant's defense.

[17] Defendant assigns as error the action of the trial judge in allowing Sheriff Huskey to testify that as a result of a telephone conversation with the deceased he told her to leave the county.

Sheriff Damon Huskey, a State's witness, testified: "I talked to Mrs. Beatrice Robbins on Saturday, May 4, 1968 about lunchtime by telephone. . . . I told her to go back into the house and get her stuff and leave the county." The Sheriff had previously testified under cross-examination by defendant: "When I asked how come you shot her, Ferrell Robbins said because she was going to leave, because her daughter wanted her to go with them down east somewhere, Charlotte or somewhere. I knew the deceased, Beatrice Robbins, was down in Raleigh at the home of her daughter, Mrs. Jacqueline Brandle, for a week or ten days before May 5, 1968."

Defendant contends that this testimony prejudiced defendant because it amounted to an inference that it was dangerous for deceased to go to her home while defendant was there. The State, on the other hand, contends that this evidence is admissible to show motive. However, without reaching the merits of either contention, it is apparent that the admissions of this evidence becomes harmless and was cured by the testimony elicited by defendant from the Sheriff (quoted above), and for the further reason that defendant's witness Dean Sheehan thereafter gave powerful evidence of motive, premeditation and deliberation when he testified concerning a suicide pact between defendant and deceased.

The admission of testimony over objection is ordinarily rendered harmless when defendant elicits similar testimony on cross-examination or introduces similar testimony himself. *State v. Jarrett,* 271 N.C. 576; *State v. Adams,* 245 N.C. 344; *State v. Humbles,* 241 N.C. 47. This assignment of error is overruled.

[18] The trial court's charge to the jury is challenged because of the failure of the court to define the term "malice" in charging on first degree murder, even though the court had previously defined the term.

[18, 19] The Judge correctly defined "malice" before he reached the charge on murder in the first degree. He correctly defined the crime of murder in the first degree, including the necessity that the killing be with "malice". The trial judge is not required to repeat a definition each time a word or term is repeated in the charge when

it has once been defined. *State v. Davis,* 265 N.C. 720, 145 S.E. 2d 7; *State v. Tyndall,* 230 N.C. 174, 52 S.E. 2d 272. When the charge is read contextually, we do not think that the jury was misled or confused by such omission. This assignment of error is overruled.

We have carefully examined defendant's other assignments of error and find no prejudicial error.

No error.